```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                             )     Cr. No. 04-10032 GAO
        v.                   )
                             )
VICTOR DELGADO,              )
   Defendant.                )
```

### RE-SENTENCING MEMORANDUM OF THE UNITED STATES

On August 5, 2004, the defendant, Victor Delgado (the "defendant" or "Delgado") pled guilty to one count of conspiracy to distribute more than 100 grams of heroin, thirteen substantive counts of distributing heroin, and one count of being a felon in possession of a firearm.  The Presentence Report prepared by the U.S. Probation Office, dated November 1, 2004 (the "PSR"), concluded that the defendant is a career offender, pursuant to U.S.S.G. § 4B1.1, and that his Total Offense Level (with three levels off for acceptance of responsibility) is therefore 31 and that his Criminal History Category is VI.  Accordingly, the PSR concluded that the defendant's Guideline Sentencing Range is 188-235 months.

On November 8, 2004, prior to the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2005), this Court, believing itself bound by the United States Sentencing Guidelines, sentenced the defendant to a term of imprisonment of 168 months.  The Court departed downward from the low end of 188 months based on its conclusion that the defendant's

classification as a career offender overstated his criminal history. Pursuant to U.S.S.G. § 4A1.3(b)(3), the Court concluded that it was constrained to depart only one criminal history level (to CHC V), leaving a sentencing guideline range of 168-210. See Transcript of Sentencing of 11/8/04 at 19-22. The defendant appealed. The United States moved for a remand for re-sentencing in light of Booker and this Court's statement during sentencing that "[i]f I were to choose to [depart] further than that, I would."

Notwithstanding the procedural history, and for the reasons presented herein, the government recommends that the Court re-instate the sentence of 168 months. In recognition of the Court's prior statements regarding departure in this case, the government, in the alternative, requests that, should the Court still believe a further departure is warranted, it do so in a way that is commensurate with the defendant's status as a career offender, the offense conduct, and other information presented herein and at sentencing regarding the defendant's background and characteristics. Specifically, should the Court believe that further departure is warranted, the government requests that the Court depart one further criminal history level (i.e., to level IV), resulting in a sentencing guideline range of 151-188 months, and sentence the defendant to 151 months, representing a 37-month (or 20%) departure from the low end of the Guideline Sentencing

Range of 188-235 months.

**I.  BACKGROUND OF THE INVESTIGATION[2]**

    This case arose from a six month, multi-agency investigation of members and associates of the Dome Dwellers, formerly known as the Essex Street Posse, a violent street gang operating in Lawrence, Massachusetts.  During the course of the investigation, law enforcement agents made numerous purchases of controlled substances and firearms from members and associates of the Dome Dwellers using confidential informants and cooperating witnesses.  The investigation of the Dome Dwellers was initiated based on information from law enforcement and confidential sources concerning drug trafficking by the Dome Dwellers in and around the area of the Essex Street Projects in Lawrence, Massachusetts.

    Law enforcement and confidential sources identified EDDY LOPEZ, A/K/A "SWIFT", as the leader of the Dome Dwellers, and identified VICTOR DELGADO, A/K/A "BITIN", as a close associate of LOPEZ.  As a result of the investigation, in January 2004, a grand jury returned indictments against LOPEZ, DELGADO, JOAN REYES-SANTANA, and JOSE RODRIGUEZ, A/K/A "CABLE".[3]

---

    [2] The following information is largely included in the PSR. It is repeated here for the convenience of the Court.

    [3] LOPEZ was sentenced by Judge Saris to 35 years in prison (a motion for re-sentencing is pending); REYES-SANTANA was sentenced by this Court to 5 years in prison; RODRIGUEZ was sentenced by Judge Tauro to 108 months in prison.

From November 4, 2003 through December 4, 2003, DELGADO made thirteen controlled sales of heroin to a cooperating witness working with the FBI's North Shore Gang Task Force ("the CW"); on December 8, 2003 and December 9, 2003, DELGADO made two additional sales of heroin to the CW.  On November 19, 2003, DELGADO sold the CW the use of a loaded, Ruger .357 Magnum handgun for one week for $500.[4]  All of the buys were surveilled by law enforcement agents and all of the buys and many of the conversations leading up to them were consensually recorded, many in Spanish, on audiotape and/or videotape.  In total, DELGADO sold the CW 183 grams of heroin.  LOPEZ was present during several of the sales.[5]

### THE SALE OF A .357 MAGNUM HANDGUN AND 19.4 GRAMS OF HEROIN ON NOVEMBER 19, 2003

On November 19, 2003, agents met with the CW and the CW said that he/she talked with DELGADO and DELGADO told the CW to come

---

[4] In addition, on January 12, 2004, JOAN REYES-SANTANA, DELGADO's co-defendant, made a controlled sale of heroin to the CW (Count 16).

[5] Prior to each of the buys, law enforcement officials with the North Shore Gang Task Force met with and searched the CW and the car he/she would be driving to ensure that the CW had no controlled substances or cash on him/her.  Upon completing the search, the CW was given a recording device, a transmitter, a set amount of official government funds ("OGF"), and a car equipped with audio/video surveillance equipment.  In each buy, the CW was then surveilled to 30 May Street, Apartment C, in Lawrence (the residence of the Defendant), where the CW met with the Defendant.  On most occasions, DELGADO's live-in girlfriend, MARISOL ROQUE, A/K/A "CHINA", was present at 30 May Street, Apt. C.

to DELGADO's house because DELGADO was trying to get the CW a gun, as well as heroin.  The CW was surveilled to 30 May Street (where agents had already set up surveillance).  DELGADO called REYES-SANTANA and then DELGADO and the CW got into the CW's car and drove to REYES-SANTANA's home to pick up the heroin.

During the drive, which was videotaped and audiotaped from inside the CW's car, DELGADO said that he would pawn the CW his (DELGADO's) gun for one week for $500.  DELGADO can also be heard on the audiotape telling the CW that DELGADO is getting additional guns and discussing selling additional guns to the CW.  After they exchanged the heroin for the money, the CW and DELGADO returned to DELGADO's home.  When they got to the apartment, DELGADO put on a glove, reached under the sofa, and pulled out a .357 magnum revolver.[6]  The CW gave DELGADO $500 and DELGADO put the gun on a table next to the CW.  The CW picked up the gun and left the apartment.  As the CW left, DELGADO reminded the CW to call him the next day about buying the other guns.

### ADDITIONAL INFORMATION

On the evening of December 8, 2003, the CW made a controlled

---

[6] The CW saw what appeared to be a .357 magnum revolver under the same couch at 30 May Street during a controlled heroin buy on November 17, 2003.  During that buy, DELGADO's associate, EDDY LOPEZ, also showed the CW a small black pistol that LOPEZ had on his person at 30 May Street.  The CW also said that, during the November 17 buy, DELGADO told the CW that DELGADO was expecting a shipment of 200 grams of heroin the following day.

buy of nine grams of heroin from DELGADO for $800 in OGF.  During the buy, the CW asked DELGADO about a gun and DELGADO said he had a .40 caliber but could not sell it to the CW.

On December 17, 2003, agents met with th CW who said me that he/she had received a call from DELGADO's associate, EDDY LOPEZ, who told the CW that "they" had done a home invasion and gotten 240 grams of heroin, and that LOPEZ had twenty grams to sell to the CW for $1,200.  LOPEZ also said that he had cocaine for the CW.  The CW made a consensually recorded call to 978-397-2180, LOPEZ's cellular telephone, and LOPEZ told the CW to meet LOPEZ at DELGADO's residence -- 30 May Street, Apt. C.

The CW went to 30 May Street and met with LOPEZ and DELGADO. Afterward, the CW stated that LOPEZ was sitting on a couch holding a bag containing what appeared to be five to six ounces of cocaine, and that LOPEZ put the bag on the couch and then threw the CW a small bag of cocaine, explaining to the CW that it was better than the cocaine LOPEZ had shown the CW at LOPEZ's house the other day.  The CW then gave LOPEZ $600 in OGF for the cocaine.

The CW asked LOPEZ how much cocaine he had in the bag and LOPEZ said that he had 130 grams in the bag and that he was going to sell it to a kid for $3,000.  The CW then asked DELGADO for some heroin and DELGADO said he had some earlier but had moved it to another location and they would have to go get it.  The CW

6

then asked LOPEZ about getting some heroin and LOPEZ told the CW to talk to DELGADO and explained that he and DELGADO sold the same heroin but had their own customers.  LOPEZ also said that his cousin was selling LOPEZ a .45 semi-automatic pistol and explained that he (LOPEZ) was adding to his collection of guns.

**II.  THE DEFENDANT'S STATUS AS A CAREER OFFNDER**

At the original sentencing, this Court properly concluded that the defendant is a career offender.  As the PSR properly noted, the defendant's career offender predicates are (i) a prior conviction for assault & battery on a police officer and (ii) a prior conviction for assault & battery (which also included convictions for threatening to commit murder and a second conviction for assault & battery).  PSR ¶¶ 78-79.[7]

The First Circuit has squarely held that, because of the "high risk of physical injury and violence," "'assault and battery upon a police officer, in violation of Mass. Gen. L. ch. 265, § 13D, is categorically a crime of violence within the meaning of the career offender provisions'" of § 4B1.1.  United States v. Santos, 363 F.3d 19, 23 (1st Cir.2004) (quoting United States v. Fernandez, 121 F.3d 777 (1st Cir.1997)).  Consequently,

---

[7] Both of Delgado's convictions are felonies under Massachusetts state law . See M.G.L. c. 265 § 13A (whoever commits an assault and battery upon another shall be punished by imprisonment for not more than 2½ years in a house of correction); M.G.L. § 265 § 13D (penalty for assault and battery on a public employee imprisonment for not less than 90 days and not more than 2½ years in a house of correction).

the sentencing court is not required to look further than the statute itself.  Id.[8]

With respect to the crime of assault and battery, the Santos court specifically rejected the Seventh Circuit's conclusion in United States v. Jones, 235 F.3d 342 (7th Cir.2000), that "where the charging documents use 'boilerplate' language to allege an assault and battery under Massachusetts law, a sentencing court may not use that prior conviction to enhance a sentence." Santos, 363 F.3d at 23-24.  Instead, the Santos court concluded that the sentencing court may rely on "the charging documents and other uncontested allegations" to determine whether the defendant committed a violent assault and battery or "a nonharmful type of assault and battery."  Id. at 24.

The PSR provides the following information with respect to Delgado's assault and battery conviction.

According to the Lawrence Police Department report, on

---

[8] In any event, the PSR clearly shows that the defendant committed a violent and dangerous assault and battery on a police officer.  The PSR provides the following information with respect to the A&B PO.  According to the Lawrence Police Department report, dated 4/4/98, the defendant was seen by a police officer drinking a beer in public.  When the officer approached the defendant, the defendant "shoved the officer in the chest and walked away into the parking lot."  PSR ¶ 78.  When the officer caught up to the defendant and told him that he was under arrest, "[t]he defendant struggled to get away from the officer and told people around him to help him get away."  Id.  A crowd of people gathered but did not attempt to help the defendant.  Id.  As noted in the PSR, the defendant is a former boxer.  PSR ¶ 94.

> 10/12/99, police received a report from the manager of the Valley Lodging South relating that earlier in the day she had asked the defendant for identification so that she could complete his rental application. He became very upset and called her a "nigger" and a "bitch", stating that he was going to kill her. He charged at her but in the process threw another female bystander to the ground where she struck her head against a wall.

PSR ¶ 79.

As noted, Delgado pled guilty to two counts of assault and battery and one count of threat to commit murder. The police report plainly shows that, as in Santos, "the statutory definition and charging documents established that the crime contemplated by both [Delgado] and the government in his guilty plea was not a mere 'nonconsensual touching,' but a 'physically harmful' or 'potentially physically harmful' one that qualifies as a crime of violence under § 4B1.2." Santos, 363 F.3d at 24 (also noting that "the Seventh Circuit's animating concern was absent both here and in Mangos, where we discerned 'nothing in the record or the charging document' that suggested the defendant committed a nonharmful type of assault and battery").

Santos is consistent with the guidelines, which define "crime of violence" in the career offender provision as any offense punishable by imprisonment for more than one year that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1). The police report states that the defendant

9

threatened to kill the manager and then charged at her and in the process "threw another female bystander to the ground where she struck her head against a wall." PSR ¶ 78. This is plainly the type of violent assault contemplated by the career offender provision.

For the foregoing reasons, this Court and the PSR properly found that the defendant is a career offender under U.S.S.G. § 4B1.1.

### III. THE APPROPRIATE SENTENCE

The defendant asks that the Court sentence him to a term of imprisonment of 72 months. This represents more than a 150% decrease from the low end of the guideline sentencing range of 188-235 months. The defendant thus asks this Court to simply turn a blind eye to his criminal record and the fact that he is a career offender under the guidelines. This massive departure is wholly unwarranted.

The premise of the defendant's argument is that he "could be characterized as a mid-level street trafficker, nothing more." Deft's Memo. at 4. This argument ignores the fact that the defendant sold the CW a loaded, .357 magnum handgun and said on tape that he had a .40 caliber handgun that he would not sell the CW. It also ignores the fact that the defendant was arrested as part of an FBI gang task force investigation of the Dome Dwellers, a violent Lawrence street gang. At the outset of the

investigation, confidential sources indicated that DELGADO was a close associate, and drug trafficking partner, of EDDY LOPEZ, the leader of the Dome Dwellers.  This was corroborated during the course of the investigation when DELGADO and LOPEZ frequently hung out together at DELGADO's house and sold drugs to the CW in the presence of each other.[9]

In addition to being an enthusiastic peddler of heroin, DELGADO sold a loaded handgun, by his own admission possessed another gun, and was a close associate with the leader of a violent street gang.  Viewed in this light, his two prior convictions for assault & battery, and assault & battery on a police officer, show him to be a danger to society.

All of this information is relevant for sentencing purposes because it gives the Court a sense of who DELGADO is.  Federal law makes it abundantly clear that there is no limit upon the discretion of a district court to entertain evidence regarding the background, character, and conduct of a defendant for purposes of imposing an appropriate sentence.

---

[9] LOPEZ, who was sentenced by Judge Saris to 35 years in prison as a result of this investigation, was recently indicted in Essex Superior Court for the 2003 murder of a rival gang member, JAY MARTINEZ, who was shot 18 times while he sat in his car outside a pizzeria in Lawrence.  LOPEZ has moved to be re-sentenced in federal court based on one of his career offender predicates being overturned in state court.  That motion is pending.

21 U.S.C. § 850, entitled "Information for Sentencing, provides as follows:

> Except as otherwise provided in this subchapter or section 242a(a) of Title 42, <u>no limitation shall be placed on the information concerning the background, character, and conduct</u> of a person convicted of an offense which a court of the United States <u>may receive and consider for the purposes of imposing an appropriate sentence</u> under thus subchapter or subchapter II of this chapter.

(Emphasis added.) The First Circuit has interpreted this language in the only fashion to which it is susceptible.

> [T]he Comprehensive Drug Abuse Prevention and Control Act (of which § 849 is a part) specifically states that, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence . . . ." This provision codifies the principle that when setting a sentence, a judge can consider a virtually unrestricted range of information, including hearsay, other information that might be inadmissible at trial, and evidence not specified in a § 849(a) pretrial notice.

<u>United States v. Moccia</u>, 681 F.2d 61 (1st Cir.1982) (internal and other citations omitted). <u>See also</u> 18 U.S.C. § 3661 "Use of Information for Sentencing" ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.").

Finally, this Court should take into consideration, that the career offender provision of the Guidelines is unique. The

Sentencing Commission promulgated the career offender provision pursuant to a clear and specific Congressional policy declaration which was embodied in statute. In 28 U.S.C. § 994, entitled "Duties of the Commission", Congress directed the Commission to create a guidelines provision that would ensure that a certain, defined category of repeat offenders (so called "career offenders") would be sentenced to a term of imprisonment at or near the maximum term authorized.

    Section 994 directed the Commission as follows:

(h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and--

    (1) has been convicted of a felony that is--

        (A) a crime of violence; or

        (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.); and

    (2) has previously been convicted of two or more prior felonies, each of which is--

        (A) a crime of violence; or

        (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.).

28 U.S.C. § 994(h). In light of this Congressional directive,

the Sentencing Commission promulgated the career offender provision of the guidelines -- U.S.S.G. §4B1.1, which essentially mirrors 28 U.S.C. § 994(h).

The defendant asks the Court to completely and utterly ignore the career offender provision of the Guidelines. In light of the plain Congressional directive that led to the career offender provision, and this Court's prior conclusion that the defendant is a career offender, this Court should lend the provision due weight.

The factors listed in 18 U.S.C. § 3553 also support the initial sentence or something close thereto. Such a sentence reflects the seriousness of the offenses in this case (selling heroin and a loaded firearm); the history and characteristics of the defendant (his status as a career offender, his close association with the leader of a violent street gang, his acknowledgment that he had another gun); promotes respect for the law; and will provide deterrence and protect the public from further crimes of the defendant.

## CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence the defendant to a term of imprisonment of 168 months or, in the alternative, if the Court still believes that a further departure is warranted, that the Court depart an additional criminal history level and sentence the defendant to a

term of imprisonment of 151 months, representing a 20% departure from the low end of the Guideline Sentencing Range of 188-235 months.

                    Respectfully submitted,

                    MICHAEL J. SULLIVAN
                    United States Attorney,

          By:  /S/ PETER K. LEVITT
               PETER K. LEVITT
               Assistant U.S. Attorney
               One Courthouse Way
               Boston, MA 02210
               (617)748-3355

November 14, 2006